# EXHIBIT A

EFILED  01/08/25 04:52 PM  CASE NO. 25C75  Joseph P. Day, Clerk

**IN THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE
TWENTIETH JUDICIAL DISTRICT, AT NASHVILLE**

| | |
|---|---|
| TIME FOR A CHANGE THERAPY, LLC, | |
| Plaintiff, | **CASE NO.: _____** |
| v. | |
| CHANGE HEALTHCARE INC. and UNITEDHEALTH GROUP, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

**COMPLAINT**

Plaintiff Time for a Change Therapy, LLC ("Plaintiff"), by and through the undersigned counsel, brings this complaint for damages and injunctive relief against Defendants Change Healthcare Inc. ("Change") and UnitedHealth Group, Inc. (collectively "Defendants"). Plaintiff makes the following allegations based upon personal knowledge as to its own actions and upon information and belief as to all other matters:

**NATURE OF THE ACTION**

1.      Across the United States, healthcare providers have been placed in financial peril because of a data breach on Defendants' information systems. Like many providers, Plaintiff has struggled to continue operations, has had to take out high interest loans, has expended hundreds of hours because of Defendants' failures, and has been unable to take on as many clients because of the time spent responding to the Data Breach.

2.      A ransomware group claims to have accessed Change's servers and seized six terabytes of critical confidential and highly sensitive information before deploying ransomware to Change Healthcare's infrastructure, resulting in network outages that have already impacted

1

millions of patients and physicians across the country.[1] On February 21, 2024, Change disclosed that it was the subject of this massive data breach whereby hackers known as "ALPHV/Blackcat" ("Blackcat") gained unauthorized access to its networks (the "Data Breach").

3.      Blackcat, also known as ALPHV, is a notable cybergroup that infiltrates healthcare institutions' internal servers through vulnerabilities in their networks. The group is one of the more active cybergangs and often targets high-value institutions and businesses.[2] According to the Department of Justice, Blackcat typically performs double-extortion attacks whereby it steals victims' data *and* encrypts the institution's data, networks, and servers, blocking the institution from accessing them. The group then demands the institution pay a ransom in exchange for the keys to decrypt the institution's network and servers. In exchange for ransom, Blackcat also offers a promise that it will not publish the institution's data to Blackcat's site on the Dark Web. Still, even when ransoms are paid, this data often ends up on the Dark Web. Blackcat has emerged as the second most prolific ransomware-as-a-service variant in the world.[3]

4.      Blackcat accessed, copied, and exfiltrated highly sensitive information stored on Change's servers for millions of individuals, including active US military/navy personnel identifiable information, medical records, dental records, payment information, claims information, patients' information (such as phone numbers, addresses, Social Security numbers,

---

[1] Steve Adler, *UnitedHealth Group Confirms Data Stolen in Change Healthcare Ransomware Attack*, THE HIPAA JOURNAL (Mar. 29, 2024), https://www.hipaajournal.com/change-healthcare-responding-to-cyberattack.

[2] James Farrell, *Change Healthcare Blames 'Blackcat' Group for Cyber Attack That Disrupted Pharmacies and Health Systems*, FORBES (Feb. 29, 2024, 1:18 PM), https://www.forbes.com/sites/jamesfarrell/2024/02/29/change-healthcare-blames-blackcat-group-for-cyber-attack-that-disrupted-pharmacies-and-health-systems/?sh=589769fc1c4d.

[3] U.S. Dep't of Justice, *Justice Department Disrupts Prolific ALPHV/Blackcat Ransomware Variant*, DOJ (Dec. 19, 2023), https://www.justice.gov/opa/pr/justice-department-disrupts-prolific-alphvblackcat-ransomware-variant.

EFILED  01/08/25 04:52 PM  CASE NO. 25C75  Joseph P. Day, Clerk

emails, etc.), insurance records, and more ("PHI").[4] Blackcat also encrypted portions of Change's network, rendering them unusable.

5.      Blackcat has also shared the stolen data with other criminal affiliates.

6.      Defendants reportedly paid a ransom of $22 million to Blackcat, but one of Blackcat's affiliates claimed to still have a copy of the stolen data and that it was not paid its share of the ransom.[5]

7.      The fallout from this Data Breach has and will continue to wreak havoc on the healthcare industry. As a subsidiary of one of the largest healthcare insurers, Change Healthcare processes 15 billion transactions annually, "touching one in three U.S. patient records."[6] But to stop the cybersecurity wound from bleeding further, Change decided to take certain systems offline. One of these systems was the Change Healthcare platform ("Change Platform"). This platform provides, among other things, a revenue and payment cycle management service that connects payers, providers, and patients within the U.S. healthcare system.[7] The Change Platform is widely used among practitioners and health services providers, including Plaintiff.

8.      Without the Change Platform, the healthcare industry was immobilized. Patients were stuck in prescription purgatory without access to their vital medications. This was especially disruptive to elderly patients who have a fixed income and cannot afford medications without

---

[4] *MMRG Notifies Patients of Cybersecurity Incident*, BUSINESS WIRE (Feb. 6, 2024, 5:30 PM), https://www.businesswire.com/news/home/20240206060527/en.
[5] Steve Adler, *UnitedHealth Group Confirms Data Stolen in Change Healthcare Ransomware Attack*, THE HIPAA JOURNAL (Mar. 29, 2024), https://www.hipaajournal.com/change-healthcare-responding-to-cyberattack.
[6] Nicole Sganga & Andres Triay, *Cyberattack on UnitedHealth still impacting prescription access: "These are threats to life,"* CBS NEWS (Feb. 29, 2024, 9:00 PM), https://www.cbsnews.com/news/unitedhealth-cyberattack-change-healthcare-prescription-access-still-impacted.
[7] *Revenue Cycle Management*, CHANGE HEALTHCARE, https://www.changehealthcare.com/revenue-cycle-management (last visited June. 13, 2024).

COPY

insurance, as well as individuals with chronic illnesses who face life-threatening symptoms without their medication.

9.      The ripple effect of the Data Breach is also hampering healthcare providers' practices. According to John Riggi, national advisor for cybersecurity and risk at the American Hospital Association, "… [T]his cyberattack has affected every hospital in the country one way or another."[8] Many providers are having trouble verifying patient eligibility and coverage, filing claims, and billing patients.[9] This leaves small and mid-sized practices especially vulnerable without normal cash flow to sustain operations. These healthcare practices have received little, if any, reimbursement from insurers for patient visits. Without these reimbursements, small and mid-sized practices face financial ruin. Indeed, Plaintiff has faced significant financial hardship, has had to take out expensive loans, and has lost significant business because of the time that Plaintiff has had to dedicate to responding to the Breach.

10.     Change is responsible for the Data Breach because it failed to implement reasonable security procedures and practices—as admitted by its parent company's CEO. Indeed, he admitted in testimony before the U.S. Senate's Finance Committee that Change failed to implement one of the most basic and industry standard cybersecurity safeguards, multi-factor authentication, and that the failure was the cause of the Breach.[10]

11.     In the wake of the Data Breach, numerous class action lawsuits were filed, and the

---

[8] Nicole Sganga & Andres Triay, *Cyberattack on UnitedHealth still impacting prescription access: "These are threats to life,"* CBS NEWS (Feb. 29, 2024, 9:00 PM), https://www.cbsnews.com/news/unitedhealth-cyberattack-change-healthcare-prescription-access-still-impacted.

[9] Associated Press, *Minnetonka Based United Healthcare Hacked*, KNSI (Feb. 29, 2024, 5:46 PM), https://knsiradio.com/2024/02/29/minnetonka-based-united-healthcare-hacked/.

[10] Tom Murphy, *Change Healthcare cyberattack was due to a lack of multifactor authentication, UnitedHealth CEO Says*, Associated Press (May 1, 2024), https://apnews.com/article/change-healthcare-cyberattack-unitedhealth-senate-9e2fff70ce4f93566043210bdd347a1f.

Judicial Panel on Multidistrict Litigation ultimately centralized and consolidated those cases in the U.S. District Court for the District of Minnesota. Nevertheless, Plaintiff brings this Action as a standalone case and will opt out from any settlement reached in the MDL, as Plaintiff does not wish to participate in the class action.

## PARTIES

12.     Plaintiff Time for a Change Therapy, LLC is a Michigan limited liability company with its principal place of business in Holland, Michigan.

13.     Defendant Change Healthcare Inc. is a Delaware corporation with its principal place of business at 424 Church Street, Suite 1400, Nashville, Tennessee.

14.     Defendant UnitedHealth Group, Inc. is a Delaware corporation with its principal place of business in Minnetonka, Minnesota.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this Action pursuant to Tenn. Code Ann. § 16-10-101. Further, the actions giving rise to this action occurred in this County, including Defendants' decisions not to implement the reasonable, industry standard cybersecurity safeguards that it was legally obligated to implement and maintain.

16.     Moreover, this Court has personal jurisdiction over Change because it maintains and operates its headquarters in this County.

17.     Venue is this County pursuant to Tenn. Code Ann. § 20-4-101 because the claims presented here arose in this County and Change resides here.

## FACTUAL ALLEGATIONS

18.     Change Healthcare is a healthcare technology company that provides data-driven and analytics-driven solutions for clinical, financial, administrative, and patient management to

5

EFILED  01/08/25 04:52 PM  CASE NO. 25C75  Joseph P. Day, Clerk

healthcare providers.[11] Change is one of the largest processors of prescription medications in the United States and handles billing for more than 67,000 pharmacies across the country through which it handles 15 billion healthcare transactions annually.[12]

19.    Change stores patients' highly sensitive health information collected from myriad clients like Medicare, pharmacies, healthcare providers, and so on. This includes patients' full names, phone numbers, addresses, Social Security numbers, emails, medical records, dental records, payment information, claims information, insurance records, and much more.

20.    Given the amount and sensitive nature of the data it stores, Change maintains a privacy policy describing how confidential and personal information is used and disclosed: "[w]e implement and maintain organizational, technical, and administrative security measures designed to safeguard the data we process against unauthorized access, destruction, loss, alteration, or misuse. These measures are aimed at providing on-going integrity and confidentiality of data, including your personal information."

21.    Given its representations and experience handling PHI and in operating in the healthcare industry, Change understand the gravity of the harms that its providers would suffer if it failed to properly implement cybersecurity measures. Indeed, Change knew that the PHI it collected would make it a target and would increase the likelihood of a Data Breach that could and would take its systems offline—systems that it knew its provider customers depended on for their

---

[11] OptumInsight and Change Healthcare Combine to Advance a More Modern, Information and Technology-Enabled Health Care Platform, OPTUM (Jan. 6, 2021), https://www.optum.com/en/about-us/news/page.hub.optuminsight-change-healthcare-combine.html.

[12] Zack Whittaker, *UnitedHealth confirms ransomware gang behind Change Healthcare hack amid ongoing pharmacy outages*, TECHCRUNCH (Feb. 29, 2024, 9:15 AM) https://techcrunch.com/2024/02/29/unitedhealth-change-healthcare-ransomware-alphv-blackcat-pharmacy-outages/.

COPY

livelihood.

22.     Notwithstanding this knowledge, Defendants failed to have proper cybersecurity systems in place, such as multifactor authentication, and failed to have reasonable policies in place for how to operate in the event of an attack.

### *The Data Breach*

23.     On February 21, 2024, in an SEC filing, UnitedHealth Group announced that "a suspected nation-state associated cyber security thread actor had gained access to some of the Change Healthcare information technology systems."[13] After detecting the breach, UHG claimed to have "proactively isolated the impacted systems from other connecting systems…"[14] UHG also said it was "working with law enforcement" and allegedly "notified customers, clients and certain government agencies" of the breach.[15] UnitedHealth Group disclosed that the "network interruption [was] specific to Change Healthcare."[16]

24.     Blackcat disclosed that the exfiltrated data includes millions of: "active US military/navy personnel PII," "medical records," "dental records," "payments information," "Claims information," "Patients PII including Phone numbers/addresses/SSN/emails/etc…," "3000+ source code files for Change Health solutions…," "Insurance records," and "many many more." Blackcat warned UHG that "you are walking on a very thin line be careful you just might fall over."

25.     The Change Platform was disconnected following the Data Breach. Through the Change Platform, healthcare providers—who have paid for this service—submit insurance claims.

---

[13] *UnitedHealth Group Incorporation Form 8-K*, SEC (Feb. 21, 2024), https://www.sec.gov/Archives/edgar/data/731766/000073176624000045/unh-20240221.htm.
[14] *Id.*
[15] *Id.*
[16] *Id.*

These claims are sent to health insurance companies to evaluate and process. Providers then receive reimbursement payments from the insurance company.

26.     Because of the Breach, the Change Platform remained inoperable for weeks and it took months after that for the service to entirely normalize and for the backlog of claims to be resubmitted and approved. Indeed, at times, Change required the resubmittal of claims that it incorrectly deemed insufficient or that it improperly denied because of the Data Breach.

27.     The Change Platform handles fifteen billion healthcare transactions (or about one-in-three U.S. patient records). That means that the normal method of transmitting claims for payment has been disrupted for a huge swath of providers' claims. Moreover, many providers *only* use Change for claims submission, meaning that for those providers, the impact has been to completely stop the flow of payments.

28.     The potential impact of the Data Breach is enormous, and its effects have delt a significant blow to Plaintiff's financial stability.

***UnitedHealth Group CEO Confirms Lack of Multi-Factor Authentication Caused the Breach***

29.     UnitedHealth Group's Chief Executive Officer, Andrew Witty, testified on May 1, 2024, in a hearing before the U.S. Senate's Committee on Finance, which is available to stream at https://www.finance.senate.gov/hearings/hacking-americas-health-care-assessing-the-change-healthcare-cyber-attack-and-whats-next.

30.     Defendant UnitedHealth Group, whose revenue last year alone was $324 billion, owns Change Healthcare.

31.     Although UnitedHealth Group had acquired Change Healthcare a year and a half earlier, and knew that its technology systems were old and out-of-date, it still failed to implement multi-factor authentication—even though such implementation can be accomplished in a matter of days or weeks if a company is motivated to do so, as can be seen by the rate of speed at which

COPY

the company implemented multi-factor authentication after discovering the Breach.

32.     Senator Wyden remarked that Defendants owe the American people an explanation regarding why they did not protect their systems with multi-factor authentication before the Breach and why their disaster and incident response planning so woefully inadequate such that they were unable to recover in a timely manner in that the company "flunked both" the need to protect data and the need to have important redundancies in place to recover and prevent harm to providers and patients.

33.     Because the healthcare industry is one of the top targets of ransomware, as multiple Senators noted, Change Healthcare and UnitedHealth Group should have known that it had a duty to implement reasonable cybersecurity protections, including the most basic best practices like multi-factor authentication.

34.     As Senator Wyden remarked, the credit monitoring that Defendants are offering is "cold comfort" to the many millions of Americans who are still "in the dark" about how much of the sensitive information was stolen by cybercriminals.

35.     Senator Wyden later noted that the attack could have been prevented by implementing "cybersecurity 101."

36.     Indeed, Mr. Witty confirmed that the company had a policy requiring multi-factor authentication on all of its external facing systems and simply failed to ensure that its own internal policies were followed.

37.     Senator Wyden further noted that small mental health providers, like Plaintiff, "have been left holding the bag" while being "unable to get straight answers" after what many consider the largest healthcare data breach "in American history."

38.     Senator Crapo further noted: "For patients, the emotional and financial effects of

9

leaked private information can have a devastating impact for years."

39.     In his opening remarks, CEO Andrew Witty confirmed that the "the portal [the hackers] accessed was not protected by multi-factor authentication."

40.     He then confirmed that the exfiltrated data contained the sensitive personally identifiable information and protected health information of a "substantial proportion of people in America."

41.     Senator Wyden then asked, "How much longer will a provider who sent in a claim for services delivered in February have to wait in order to be paid?" Although Mr. Witty testified that he believed payments were essentially back to normal, providers across the across—including Plaintiff—still wait to be paid.

42.     As Senator Warren later pointedly and correctly remarked, the Breach has put "hundreds of thousands" of medical providers "on the brink of collapse."

### The Data Breach was Preventable

43.     As was made evident in the Congressional hearing, Change's cybersecurity practices and policies were inadequate and fell short of the industry-standard measures that should have been implemented long before the Data Breach occurred. This is especially true given that the healthcare industry is frequently one of the most targeted sectors for cyberattacks. Attacks using stolen credentials have increased precipitously over the last several years.

44.     Healthcare providers and their affiliates like Change are prime targets because of the information they collect and store, including financial information of patients, login credentials, insurance information, medical records and diagnoses, and personal information of employees and patients—all extremely valuable on underground markets.

45.     This was known and obvious to Change as it observed frequent public

announcements of data breaches affecting healthcare providers and knew that information of the type it collected, maintained, and stored is highly coveted and a frequent target of hackers.

46.     Given that the PHI it collected made it an obvious target for cybercriminals and because of the prevalence of dual extortion events in which data is exfiltrated and ransomware is deployed, Defendants Change should have known that it systems were at risk of being taken offline such that it should have been prepared with tested, reasonable, and industry standard incident response, business continuity, and disaster recovery plans.

47.     According to the Federal Bureau of Investigation (FBI), phishing schemes designed to induce individuals to reveal personal information, such as network passwords, were the most common type of cybercrime in 2020, with such incidents nearly doubling in frequency between 2019 and 2020.[17]

48.     The risk is so prevalent for healthcare providers that on October 28, 2020, the FBI and two federal agencies issued a "Joint Cybersecurity Advisory" warning that they have "credible information of an increased and imminent cybercrime threat to U.S. hospitals and healthcare providers."[18] The Cybersecurity and Infrastructure Security Agency (CISA), the Department of Health and Human Services (HHS), and the FBI issued the advisory to warn healthcare providers to take "timely and reasonable precautions to protect their networks from these threats."[19]

49.     One of the most common and expected technical security barriers used to protect consumer data is multi-factor authentication. This technical safeguard is ubiquitous and is industry

---

[17] *2020 Internet Crime Report*, FBI INTERNET CRIME COMPLAINT CENTER (last visited June. 13, 2024), https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf).
[18] CISA, FBI & Dep't Health & Human Servs., *Joint Cybersecurity Advisory: Ransomware Activity Targeting the Healthcare and Public Health Sector* (October 29, 2020), https://us-cert.cisa.gov/sites/default/files/publications/AA20-302A_Ransomware%20_Activity_Targeting_the_Healthcare_and_Public_Health_Sector.pdf.
[19] *Id*.

standard for even small organizations. Change failed to implement multi-factor authentication to protect its systems and the PII it collected, resulting in this Data Breach.

50.     In addition to user training to spot phishing attacks (and tests to ensure users learn from their training), multi-factor authentication is among the most widely adopted cybersecurity controls and is undoubtedly expected in the healthcare industry.

51.     CISA guidance encourages organizations to prevent unauthorized access by:

- Conducting regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

- Regularly patching and updating software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

- Ensuring devices are properly configured and that security features are enabled;

- Employing best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

- Disabling operating system network file sharing protocol known as Server Message Block (SMB) which is used by threat actors to travel through a network to spread malware or access sensitive data.[20]

52.     The CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs

---

[20] Multi-State Info. Sharing & Analysis Ctr., *Ransomware Guide* 4, CISA.GOV (Sept. 2020), https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C_.pdf.

prior to ransomware deployment.[21] Likewise, the principle of least privilege (POLP) to all systems should be applied to all systems so that users only have the access they need to perform their jobs.[22]

53.     Despite holding the PHI of millions of patients, Change failed to adhere to these basic industry standards. Indeed, had Change implemented common-sense security measures like multi-factor authentication, the hackers would never have accessed millions of patient files and the breach would have been prevented or would have been significantly smaller in scope. Change also lacked the necessary safeguards to detect and prevent phishing attacks and failed to implement adequate monitoring or control systems to detect the unauthorized infiltration after it occurred.

54.     Change, like any entity in the healthcare industry its size storing valuable data, should have had robust protections in place to detect and terminate a successful intrusion long before access and exfiltration could expand to millions of patient files. Change's below-industry-standard procedures and policies are inexcusable given its knowledge that it was a prime target for cyberattacks.

### The Aftermath of the Data Breach

55.     Because of the Data Breach, Change disconnected certain systems including its Change Platform used by healthcare providers nationwide in connection with payment and treatment. Change did this without an adequate substitute. This decision decimated healthcare practices like Plaintiff nationwide.

56.     Because Change disconnected the Change Platform, many healthcare providers lost their primary (and in some cases their *only*) source of processing payments for their services through patients' healthcare plans and thus did not receive payment or received only a fraction of

---

[21] *Id.* at 5.
[22] *Id*. at 6.

what they were owed. Healthcare providers are absorbing these upfront costs, which risks their ability to continue operating their businesses.

57.     Moreover, because Change often blamed its outages and inability to process claims on providers, asserting that claims were improper or required resubmission, thus causing providers like Plaintiff to expend enormous resources to resubmit claims, causing backlogs in getting paid and causing providers to incur significant costs in paying employees overtime and in paying contractors to spend further time to clear the backlog of claims that required submission and resubmission.

58.     Because of the Data Breach, many healthcare providers, like Plaintiff, did not receiving Change's services that they paid for, and without these services, these providers and practices struggled to care for patients and lost significant amounts of money. As such, Plaintiff did not receive the benefit of its bargain with Change because it paid for the value of services it did not receive.

### Plaintiff Time for a Change Therapy, LLC Has Suffered Significant Losses

59.     Plaintiff Time for a Change Therapy, LLC, is a Michigan limited liability company with its principal place of business in Holland, Michigan.

60.     Michelle Sheridan is the owner of Time for a Change and is its only employee. Because of the Data Breach, she has had to spend hundreds of hours attempting to file and refile claims and attempting to be paid for the work she had already performed.

61.     Plaintiff, through its owner Michelle Sheridan, provides counseling services to its patients and relies on the Change Healthcare system to submit claims and receive payments.

62.     Plaintiff contracted with Change Healthcare, through TherapyNotes, for its platform that provides revenue and payment cycle management services.

COPY

63.     Because Plaintiff's profits are primarily derived from its ability to file insurance claims, the inability to process such claims in a timely manner devastated Plaintiff's business.

64.     Through the Change Platform, Plaintiff submits insurance claims. The claims are sent to insurance companies for evaluation and processing. Once the claims are approved, Plaintiff receives payment via ACH payments to the Time for a Change bank account.

65.     Because of the Data Breach, Plaintiff has faced significant cash flow disruptions due to an inability to submit claims or receive payments or because Change has forced her to refile claims that were already filed properly.

66.     Because of the Data Breach, Plaintiff has had to spend vast additional time and considerable expenses working with Change to attempt to resolve payment issues, including working overtime, so that she can keep her business open. Indeed, Plaintiff is unable to take as many patients as she had before and has had to turn away new business opportunities because of the significant amount of time she has been forced to spend trying to keep her business afloat because of the Data Breach, which further strains the viability of Plaintiff's business.

67.     The time Plaintiff has had to spend responding to the Breach has included time spent understanding the Data Breach and how her patients have been affected, contacting individuals and entities to seek assistance, problem solved unpaid charges, sitting on hold for excessive periods likely due to call volumes, discussing her claims with Defendants' representative's, and meeting with banks to discuss the financial issues caused by the Data Breach, including having to plead for loans to recovery from the effects of the Data Breach.

68.     Plaintiff has furthermore spent considerable time and effort examining and re-examining claims to determine which ones went through successfully and which ones did not.

69.     Moreover, Plaintiff has had to spend even more time responding to Defendants'

15

failures because of the inconsistent instructions, that sometimes changed by the day.

70.     Because of the Data Breach, Plaintiff has had to cancel appointments and turn away further business so that any available time could be spent responding to the Data Breach and collected monies owed.

71.     The added time and expense Plaintiff has been forced to incur has placed, and continues to place, significant strain on Plaintiff's finances and threatens the future viability of Plaintiff's practice.

72.     Due to the significant impact of Defendants' Data Breach, Ms. Sheridan has experienced significant stress, anxiety, and frustration that has had a serious impact on her mental health.

73.     Making the time spent worse, Change has provided Plaintiff with virtually no reliable or useful information, which has only increased the significant stress Ms. Sheridan is under in her attempts to save her business.

74.     Indeed, Plaintiff has gotten even further behind in filing additional claims with Change because Plaintiff has routinely had to resubmitted already submitted claim that Change rejected because of the failures in its system caused by the Data Breach. Though her claims were never incorrect, Change has required many such resubmissions, which causes a snowball affect of time wasted and spent attempting to save Plaintiff's business—which further prevents Plaintiff from seeing more patients.

75.     Because of the data breach, Plaintiff faces the serious risk that her business will fail in the near term without some form of relief.

76.     Notwithstanding Plaintiff's repeated urgings to Change that her business is at imminent risk of closure, Change has been unable or unwilling to ensure she is paid the amounts

16

COPY

owed.

77.     Indeed, Ms. Sheridan, in her capacity as owner of Time for a Change Therapy, has had to borrow money from multiple family members just to pay bills.

78.     Other loans to stay afloat, which Plaintiff will be required to rely on, come with high interest rates that Plaintiff would otherwise never agree to pay.

79.     Because of the Breach and the resulting financial strain on Plaintiff's business, Plaintiff has spent even more time attempting to transition to another claims processing clearinghouse.

80.     Though Defendants, through its subsidiary Optum, offered a loan of $2,500, that option was a small fraction of the many thousands of dollars in losses Plaintiff had suffered at the time, which has now increased significantly. Moreover, it required that Plaintiff repay the loan within forty-five days, so Plaintiff declined the offer because of the lack of certainty that Defendants' system issues would be resolved within that period.

81.     In all, Plaintiff has suffered losses in excess of $35,000 in direct damages, and significant additional harm in the form of hundreds of hours of time spent dealing with the aftermath of Defendants' failures, and the serious mental toll that the resulting financial distress has caused.

82.     Moreover, Plaintiff has suffered significant additional harm in the form of lost business opportunities because of the amount of time Plaintiff has had to spend responding to the Data Breach. Plaintiff has spent hundreds of hours on the phone attempting to be paid for her patients' claims. This time loss has prevented her from accepting new patients even though she has received many such requests.

COPY

*Change Failed to Comply with Federal Law and Regulatory Guidance*

83.    Change is covered by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (see 45 C.F.R. § 160.102) and as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

84.    These rules establish national standards for the protection of patient information, including PHI, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. 45 C.F.R. § 160.103.

85.    HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information."[23]

86.    HIPAA requires that Change implement appropriate safeguards for this information.[24]

87.    HIPAA requires that Change provide notice of a breach of unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons—i.e. non-encrypted data.[25]

88.    Despite these requirements, Change failed to comply with its duties under HIPAA and its own privacy policies. Indeed, Change failed to:

    a.  Maintain an adequate data security system to reduce the risk of data breaches and

---

[23] 45 C.F.R. § 164.502.
[24] 45 C.F.R. § 164.530(c)(1).
[25] 45 C.F.R. § 164.404; 45 C.F.R. § 164.402.

cyberattacks;

b.  Adequately protect the PHI of patients;

c.  Ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d.  Implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e.  Implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f.  Implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g.  Protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

h.  Maintain and test sufficient incident response, business continuity, and disaster recovery plans;

i.  Ensure compliance with the electronically protected health information security standard rules by their workforces, in violation of 45 C.F.R. § 164.306(a)(4); and/or

j.  Train all members of their workforces effectively on the policies and procedures

19

EFILED  01/08/25 04:52 PM  CASE NO. 25C75  Joseph P. Day, Clerk

with respect to protected health information as necessary and appropriate for the members of their workforces to carry out their functions and to maintain security of protected health information, in violation of 45 C.F.R. § 164.530(b).

89.     Additionally, federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[26]

90.     The FTC's publication *Protecting Personal Information: A Guide for Business* sets forth fundamental data security principles and practices for businesses to implement and follow as a means to protect sensitive data.[27] Among other things, the guidelines note that businesses should (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.[28]

91.     Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security;

---

[26] *Start with Security*, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[27]     *Protecting Personal Information* (October 2016), FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[28] *Id.*

monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[29] This is consistent with guidance provided by the FBI, HHS, and the principles set forth in the CISA 2020 guidance.

92.     The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[30]

93.     Change was fully aware of its obligation to implement and use reasonable measures to protect the PHI of the patients but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. Change's failure to employ reasonable measures to protect against unauthorized access to patient information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**CLAIMS FOR RELIEF**

**COUNT I**
**Negligence**

94.     Plaintiff repeats and realleges the above allegations.

95.     Change required patients' PHI as a condition of receiving healthcare services and to perform Change's functions in connection with patients receiving medical treatment, including the processing of claims. Because of the significant amount of PHI and PII Change collected, it knew it was a likely target for cybercriminals.

---

[29] Start With Security, supra note 33.
[30] *Privacy and Security Enforcement* (last visited June 13, 2024), FTC, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement.

COPY

96.     Moreover, because of its significant market share, and its role as a claim clearinghouse, Change knew that Plaintiff relied heavily on it to process such claims and knew that an interruption in that service would place Plaintiff's business operations in financial peril.

97.     Change owed Plaintiff a duty to exercise reasonable care in protecting it from the foreseeable harms of a data breach. Change acknowledged this duty in its privacy policies, where it promised not to disclose PHI, including SSNs, without authorization and to abide by all federal laws and regulations. Indeed, because of the ubiquity of data breaches and the degree to which providers depend on Change, Change knew that a breach of its systems could be catastrophic to providers—especially small businesses—if Change failed to ensure reasonable security protocols were in place, including multifactor authentication and appropriate incident response and business continuity and disaster recovery plans.

98.     Change owed a duty of care to Plaintiff to provide adequate data security, consistent with industry standards, to ensure that Change's systems and networks adequately protected the PHI.

99.     Defendants' duty to use reasonable care in protecting PHI arises because of the parties' relationship, as well as common law and federal law, including the HIPAA and FTC regulations described above and Change's own policies and promises regarding privacy and data security.

100.    Indeed, the foreseeability of the harm here is obvious. Change knew it was a market leader in healthcare claim processing and it knew small businesses, like Plaintiff, would be devastated financially if that claim process ended or was substantially interrupted.

101.    Change knew, or should have known, of the risks inherent in collecting and storing PHI in a centralized location, Change's vulnerability to network attacks, and the importance of

COPY

adequate security.

102. Change breached its duty to Plaintiff in numerous ways, as described herein, including by:

- Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect PHI and ensure continued business operations;

- Failure to have sufficient business continuity, disaster recovery, and incident response plans in place;

- Failing to comply with industry standard data security measures for the healthcare industry leading up to the Data Breach;

- Failing to comply with its own privacy policies;

- Failing to comply with regulations protecting the PHI at issue during the period of the Data Breach;

- Failing to implement and enforce multi-factor authentication; and

- Failing to adequately monitor, evaluate, and ensure the security of Change's network and systems;

103. Change's various violations and its failure to comply with applicable laws and regulations constitutes willful and wanton misconduct and gross negligence on the part of Change.

104. Change would not have disconnected the Change Platform but for its wrongful and grossly negligent breach of its duties.

105. Change's failure to take proper security measures to protect providers as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and copying of PHI by unauthorized third parties. Given that healthcare providers and affiliates are prime targets for hackers, patients are part of a foreseeable, discernible

COPY

group that was at high risk of having their PHI misused or disclosed if not adequately protected by Change. It was also foreseeable that because of a data breach, Change would have to disconnect systems that could disrupt its customers' healthcare practices.

106.    As a direct and proximate result of Change's willful and wonton misconduct, negligence, and gross negligence, Plaintiff has suffered damages, including out-of-pocket expenses associated with (i) purchasing new healthcare payment software; (ii) overtime payments to employees required to adjust to Defendants' failures and to submit and resubmit claims; and (iii) extensive lost time associated with filing and refiling claims because of Defendants' failures, amounting to hundreds of hours; and (iv) interest charges on lines of credit Plaintiff was forced to incur because of Defendants' failures. Furthermore, Plaintiff's damages include time and effort spent researching and implementing new healthcare payment software, interest payments for loan Plaintiff has had to take out because of Defendants' failures, and lost business opportunities because Plaintiff has been unable to take on as much work due to the amount of time Plaintiff has had to spend dealing with the aftermath of the Data Breach.

## COUNT II
### Third-Party Beneficiary

107.    Plaintiff repeats and realleges the above allegations.

108.    Acting in the ordinary course of business, Change contracts with healthcare providers, like Plaintiff, through third parties, to provide its Change Platform. This platform allows Change to, among other things, act as a middleman between healthcare providers and insurance companies. Healthcare providers submit insurance claims through the Change Platform, which Change sends to the insurance companies. After evaluation and processing, insurance companies then pay the healthcare providers.

109.    Plaintiff paid for Change's Platform through TherapyNotes, which maintained a

COPY

contract with Change Healthcare, including a business associate agreement mandating reasonable cybersecurity measures.

110.    Because Change knew that TherapyNotes was not the entity ultimately using its platform, it understood that small counseling businesses like Plaintiff were the ultimate beneficiaries of that contract.

111.    In February 2024, following the Data Breach, Change disconnected the Change Platform thereby severing Plaintiff's access and use of the Change Platform and breaching its contractual obligations.

112.    As a direct and proximate result of Change's breaches, Plaintiff sustained actual losses and damages, as described above.

**COUNT III**
**Unjust Enrichment**

113.    Plaintiff repeats and realleges the above allegations.

114.    Plaintiff brings this claim in the alternative to its breach of contract claim and pursuant to Rule 8.

115.    Plaintiff has an interest, both equitable and legal, in its injuries that arose from Change's wrongful conduct.

116.    Plaintiff conferred a benefit on Change in the form of monetary payment.

117.    Change appreciated and had knowledge of the benefits conferred upon it by Plaintiff.

118.    In exchange for receiving Plaintiff's money, which provided Change commercial gain, Change should have supplied Plaintiff with uninterrupted access and use of its Change Platform. However, Change disconnected the Change Platform following the Data Breach.

119.    Because of Change's conduct, Plaintiff suffered actual damages as described

herein. Under principles of equity and good conscience, Change should be compelled to disgorge all unlawful or inequitable proceeds they received from Plaintiff.

## COUNT IV
### Violation of the Tennessee Consumer Protection Act ("TCPA")
### Tenn. Code Ann. § 47-18-101 *et seq.*

120.    Plaintiff repeats and realleges the above allegations.

121.    The TCPA prohibits companies doing business in Tennessee from performing unfair and/or deceptive acts and/or practices, including by failing to implement reasonable cybersecurity measures.

122.    Defendants is a person within the meaning of the TCPA, which includes both national persons and businesses. Tenn. Code Ann. § 47-18-103(14).

123.    Plaintiff has suffered an ascertainable loss, as Plaintiff was required to pay interest on lines of credit and incurred significant additional cost because of Defendants' failures, including its failure to have a proper cybersecurity incident response plan in place and its failure to implement reasonable cybersecurity technical controls, such as multifactor authentication.

124.    Defendants engaged in both unfair and deceptive acts and practices when it failed to implement reasonable cybersecurity technical and administrative controls, at least including adequate incident response and business continuity plans and multifactor authentication.

125.    Defendants' failures are deceptive given its representations that it abides by HIPAA's requirements to safeguard consumer and patient information, which if it had done would have prevented the Data Breach and Plaintiff's losses.

126.    Defendants' failures are unfair given that the failures caused substantial harm to Plaintiff and Plaintiff could not have reasonably avoided being harmed, as Plaintiff's unfair practice of failing to implement reasonable safeguards was solely within Defendants' control and

EFILED  01/08/25 04:52 PM  CASE NO. 25C75  Joseph P. Day, Clerk

even Plaintiff's knowledge.

127.    The TCPA provides a private right of action to Plaintiff because Plaintiff has suffered an ascertainable loss because of Defendants' TPCA violations.

128.    Because Defendants' decisions not to maintain and test reasonable incident response and business continuity plans was willful, and because Defendants' decision to foregoing industry standard and regulatorily required multifactor authentication was likewise willful, Plaintiff seeks treble damages. Tenn. Code Ann. § 47-18-109(a)(3).

129.    Moreover, violations of the TCPA cannot be waived by agreement.

## COUNT V
### Violation of the Michigan Consumer Protection Act ("MCPA")
### Michigan Compiled Laws Ann. § 445.901 *et seq.*

130.    Plaintiff repeats and realleges the above allegations.

131.    Plaintiff brings this claim in the alternative to Count IV.

132.    The MCPA prohibits companies from performing unfair and/or deceptive acts and/or practices, including by failing to implement reasonable cybersecurity measures.

133.    Defendants is a person within the meaning of the MCPA, which includes both national persons and businesses. Mich. Compiled Laws Ann. § 445.902(1)(d).

134.    The MCPA provides a private right of action to Plaintiff, which also provides for statutory damages or actual damages, and attorneys' fees. *Id.* § 445.911.

135.    Acts and practices deemed to be a violation of Section 5 of the FTC Act is likewise a violation of the MCPA. *Id.* § 445.911(4)(c).

136.    Plaintiff has suffered an ascertainable loss, as Plaintiff was required to pay interest on lines of credit and incurred significant additional cost because of Defendants' failures, including its failure to have a proper cybersecurity incident response plan in place and its failure to

EFILED  01/08/25 04:52 PM  CASE NO. 25C75  Joseph P. Day, Clerk

implement reasonable cybersecurity technical controls, such as multifactor authentication.

137.    Defendants engaged in both unfair and deceptive acts and practices when it failed to implement reasonable cybersecurity technical and administrative controls, at least including adequate incident response and business continuity plans and multifactor authentication.

138.    Defendants' failures are deceptive given its representations that it abides by HIPAA's requirements to safeguard consumer and patient information, which if it had done would have prevented the Data Breach and Plaintiff's losses.

139.    Defendants' failures are unfair given that the failures caused substantial harm to Plaintiff and Plaintiff could not have reasonably avoided being harmed, as Plaintiff's unfair practice of failing to implement reasonable safeguards was solely within Defendants' control and even Plaintiff's knowledge.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A.  That the Court award Plaintiff compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

B.  That the Court award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

C.  That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Change as a result of their unlawful acts, omissions, and practices;

D.  That Plaintiff be granted the declaratory and injunctive relief sought herein;

E.  That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

F.  That the Court award pre-and post-judgment interest at the maximum legal rate and all

28

COPY

such other relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial in the instant action.

Dated: January 8, 2025

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV (BPR #23045)
Grayson Wells (BPR #039658)
Miles M. Schiller (BPR # 041531)
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Ave., Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com
mschiller@stranchlaw.com

*Counsel for Plaintiff*

29